IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| **JEFFREY BONKOWSKI,** ) | CIVIL ACTION NO. 12-00812 |
| ) | |
| Plaintiff, ) | |
| ) | |
| v. ) | |
| ) | |
| **OBERG INDUSTRIES, INC.,** ) | |
| ) | |
| Defendant. ) | |

## MEMORANDUM OPINION

**CONTI, Chief District Judge**

### *I. Introduction*

Pending before the court is a motion for summary judgment (ECF No. 18) filed by defendant Oberg Industries, Inc. ("Oberg" or "Defendant"). Plaintiff Jeffrey Bonkowski ("Bonkowski" or "Plaintiff") initiated this action on June 14, 2012, by filing a two-count complaint against Oberg alleging: (1) Oberg retaliated against him for exercising his rights, in violation of the Family and Medical Leave Act ("FMLA"), 29 U.S.C. § 2615(a), (count one); and (2) Oberg interfered with his rights, in violation of the FMLA, 29 U.S.C. § 2615(a), (count two). On August 27, 2012, Oberg filed an answer to the complaint. (ECF No. 7.)

On May 20, 2013, after completing discovery, Oberg filed a motion for summary judgment and a brief in support of that motion. (ECF Nos. 18, 19.) That same day, Oberg filed a concise statement of material facts and an appendix thereto. (ECF Nos. 22, 23.) On June 20, 2013, Plaintiff filed a response and brief in opposition to defendant's motion for summary judgment and a response to defendant's concise statements of material facts,

(ECF Nos. 24, 25, 26.) On July 8, 2013, Oberg filed a reply brief in support of its motion for summary judgment, a response to Plaintiff's concise statement of material facts, and a supplemental appendix in support of its motion for summary judgment. (ECF Nos. 28, 29, 30.) On July 18, 2013, the parties filed their combined statement of material facts. (C.S.F. (ECF No. 31).)

## II. Factual Background

The factual background is derived from the undisputed evidence of record and the disputed evidence of record viewed in the light most favorable to the nonmovant, i.e., Plaintiff. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 255 (1986) ("The evidence of the nonmovant is to be believed, and all justifiable inferences are to be drawn in his favor.").

### A. History of Employment Relationship

Defendant is a manufacturer of precision components and tooling for a variety of industries including the medical, metal packaging, aerospace defense, automotive, consumer products and oil and gas industries. (C.S.F. ¶ 1 (ECF No. 31 at 1).) Defendant actively recruited Plaintiff and eventually hired him as a wire EDM operator on August 18, 2008. (C.S.F. ¶ 2 (ECF No. 31 at 2).) Plaintiff worked for Defendant as an "at will" employee during the "second shift" of its operations.[1] (C.S.F. ¶ 4 (ECF No. 31 at 2).) Plaintiff also regularly worked overtime on the weekends. (Jeffrey Bonkowski's Deposition ("Bonkowski Dep.") at 65 (ECF No. 21-2 at 65).)

---

[1] The "second shift" at Oberg begins at 4:00 p.m. and ends between 2 a.m. and 4 a.m. (C.S.F. ¶ 2 (ECF No. 31 at 2); Bonkowski's Deposition (Bonkowski Dep.) at 37 (ECF No. 23-1 at 4).)

Defendant regularly conducts performance appraisals of its employees and throughout the course of Plaintiff's employment, he received ratings as having achieved or exceeded expectations. (C.S.F. ¶ 3 (ECF No. 31 at 15).) Prior to the events which led to the current litigation, Plaintiff had never been disciplined under Defendant's disciplinary policy. (C.S.F. ¶ 4 (ECF No. 31at 15).)

1. **Disclosure of Plaintiff's Health Conditions to Oberg**

Plaintiff has a number of health conditions including a heart condition known as aortic bicuspid, which means that he has two heart valves as opposed to three. (C.S.F. ¶ 5 (ECF No. 31 at 15); Bonkowski Dep. at 89 (ECF 23-1 at 7).) He has also been diagnosed with diabetes and has had his colon removed. (Bonkowski Dep. at 89 (ECF No. 23-1 at 7).) In addition to these conditions, Bonkowski was diagnosed with a possible aortic aneurysm after fainting in the woods in May 2010. (C.S.F. ¶ 5 (ECF No. 31 at 15); Bonkowski Dep. at 89 (ECF No. 23-1 at 7).) Following this incident, Bonkowski informed his immediate supervisor, Jeffrey Ambrose ("Ambrose"), about his heart condition (aortic bicuspid) and the incident in the woods.[2] (C.S.F. ¶ 6 (ECF No. 31 at 16); Bonkowski Dep. at 89 (ECF No. 23-1 at 7).) The incident in the woods did not result in Plaintiff requesting leave under the FMLA, or require him to miss any work. (Bonkowski Dep. at 89-90 (ECF No. 23-1 at 7-8).)

2. **Past FMLA Leave**

On November 30, 2010, Plaintiff requested and received leave under the FMLA from Defendant. (C.S.F. ¶ 27 (ECF No. 31 at 12); Bonkowski Dep. at 48-50 (ECF No.

---

[2] Defendant disputes that Bonkowski made those disclosures and asserts that he never told Ambrose about his heart condition, the possible aortic aneurysm, or the incident in the woods. (C.S.F. ¶ 6 (ECF No. 31 at 16; Ambrose Dep. at 24 (ECF No. 30-4 at 3).)

3

21-2 at 7)).) Plaintiff requested leave in order to have a scheduled surgical procedure performed on his hand due to carpal tunnel syndrome. (Id.) Plaintiff made this request to Ambrose. (C.S.F. ¶ 28 (ECF No. 31 at 12); Bonkowski Dep. at 50 (ECF No. 21-2 at 8)).) Plaintiff's leave began on December 1, 2010, and ended on January 17, 2011. (Bonkowski Dep. at 50-54 (ECF No. 21 at 8)).) During this time, Plaintiff was granted all the leave that he requested. (C.S.F. ¶ 30 (ECF No. 31 at 12)).)[3]

### B. November 6, 2011: Plaintiff's Alleged Misbehavior

On Sunday, November 6, 2011, Plaintiff clocked in at 7:26 a.m. to begin his shift at Oberg. (Bonkowski Dep. at 67 (ECF No. 23-1 at 5)).) According to Plaintiff's co-worker Jim Berger, Plaintiff went on his lunch break at approximately 11:30 a.m. (Jim Berger's Deposition ("Berger Dep.") at 20 (ECF No. 23-22 at 3)).) Plaintiff took his lunch break in his truck so that he could call his son. (C.S.F. ¶ 9 (ECF No. 31 at 17)).) Plaintiff moved his truck away from the building and toward the end of the parking lot in order to obtain better reception on his mobile telephone. (Dep. Bonkowski at 69 (ECF 23-1 at 5)).) Plaintiff called his son who was stationed in Kuwait as part of his military deployment. (C.S.F. ¶ 9 (ECF No. 31 at 17); Bonkowski Dep. at 92 (ECF No. 23-1 at 8)).) The telephone call lasted approximately one minute because Plaintiff's son did not answer the call. (Bonkowski Dep. at 69, 73 (ECF No. 23-1 at 5-6)).) Plaintiff remained in his truck for the duration of his twenty-minute lunch break listening to the radio and awaiting a response from his son. (Bonkowski Dep. at 69 (ECF No 23-1 at 5)).) At the expiration of

---

[3] Plaintiff attributes the difference in treatment of his requests for FMLA leave to having directed his request on November 30, 2010 to Ambrose, as opposed to his November 2011 request, which was directed to Lou Proviano. (C.S.F. ¶ 30 (ECF No. 31 at 12)).)

4

his lunch break, Plaintiff returned to work and finished his shift at 3:32 p.m.[4] (Bonkowski Dep. at 67 (ECF No. 23-1 at 5).)

During Plaintiff's lunch break, Sheldon Hankey ("Hankey"), lead man of the EDM department at Oberg, noticed that Plaintiff had moved his car from the parking space closest to the door to a space near the end of the lot. (Sheldon Hankey's Deposition ("Hankey Dep.") at 14 (ECF No. 23-10 at 5).) Hankey observed Plaintiff through a small window on the back door of Oberg's facility from a distance of approximately ninety to one hundred feet. (C.S.F. ¶ 11 (ECF No. 31 at 17); Hankey Dep. at 14-15 (ECF No. 23-10 at 5).) Hankey formed the belief that Plaintiff was sleeping after observing him sitting motionless in his truck for a period of three to four minutes. (Dep. Hankey at 16 (ECF No. 23-10 at 5).) Hankey took two photographs within fifteen minutes of what he believed to be Bonkowski sleeping in his car. (Dep. Hankey at 15 (ECF No. 23-10 at 5).) Hankey forwarded these photographs to Oberg's Director of Manufacturing Operations, Nick Dilick ("Dilick"). (Hankey Dep. at 25 (ECF No. 23-10 at 6).)

The following day, Hankey met individually with grinding room supervisor Dave Santi ("Santi") and his production supervisor, Ambrose, in two separate conversations to inform them about what he observed on November 6, 2011. (Proviano Timeline at 11/7/2011 (ECF No. 23-18 at 2).) Hankey's account of Plaintiff's alleged sleeping in his truck spread throughout management, eventually reaching Dilick, Lynn Kirkland ("Kirkland") and the head of Human Resources, Lou Proviano ("Proviano"). (Id.) On November 9, 2011, after discussing the matter during two separate conversations, Proviano and Kirkland collectively decided to suspend Plaintiff for three days in response

---

[4] Defendant alleges that Plaintiff exceeded his permitted twenty-minute paid lunch break by fifteen to thirty minutes. (Proviano Dep. at 48 (ECF No. 23-2 at 7).)

5

to this perceived misconduct. (C.S.F. ¶ 15 (ECF No. 31 at 19); Proviano Timeline at 11/09/2011 (ECF No. 23-18 at 2)).

**C. Oberg's Lunch Break Policy**

Defendant permits its employees to take a twenty-minute paid lunch break. (Ambrose's Deposition (Ambrose Dep.) at 10 (ECF No. 23-5 at 4).) On weekdays, Defendant requires daylight employees to take their lunch breaks in accordance with a posted schedule. (Ambrose Dep. at 10-11 (ECF No. 23-5 at 4).) Employees working daylight shifts on the weekends—like Plaintiff in this instance—are permitted to take their lunch breaks at their discretion. (C.S.F. ¶ 7 (ECF No. 31 at 16); Ambrose Dep. at 11-12 (ECF 23-5 at 4).) Oberg's lunch break policies do not specifically prohibit employees from taking their lunch breaks in their vehicles. (C.S.F. ¶ 8(ECF No. 31 at 16).) According to Dilick and Ambrose, however, this practice is at least discouraged and at most prohibited. (Id.) The unwritten rules expressed by Dilick and Ambrose are not contained in Oberg's employee manual. (Bonkowski Dep. Ex. 4 (ECF No. 30-1 at 4-81).)

Bonkowski admitted to sleeping on his lunch break on one prior occasion due to adverse effects from his heart condition. (Bonkowski Dep. at 91 (ECF No. 21-2 at 14).) Plaintiff was not disciplined as a result of this incident because management was unaware that it had occurred. (Id.)

**D. Meetings of November 14, 2011**

On November 14, 2011, plaintiff returned to work after serving his three-day suspension. (C.S.F. ¶ 5 (ECF No. 31 at 3).) Upon his arrival at Oberg, Plaintiff was asked to meet with Proviano to discuss the circumstances surrounding the suspension. (C.S.F. ¶ 6 (ECF No. 31 at 3).) During this meeting, Proviano informed Bonkowski that he was

6

suspended for sleeping on the job, an allegation, which Plaintiff denied. (C.S.F. ¶ 16, 17 (ECF No. 31 at 19); Proviano Dep. at 64 (ECF No. 23-2 at 8).) Proviano informed Plaintiff that he would have to meet with Ambrose and Santi and they would present him with a disciplinary notice discussion note. (C.S.F. ¶ 18 (ECF No. 31 at 19); Proviano Dep. at 64 (ECF No. 23-2 at 8).) Proviano informed Bonkowski that he would be asked to sign the document, but he was not obligated to do so. (Id.) Plaintiff left the meeting with Proviano to meet with Ambrose and Santi. (C.S.F. ¶ 7 (ECF No. 31 at 3); Bonkowski Dep. at 88 (ECF No. 23-1 at 88).)

During Plaintiff's meeting with Ambrose and Santi, Plaintiff was once again informed about the reason for his three-day suspension. (Santi Dep. at 36 (ECF No. 21-4 at 3).) Plaintiff was presented with the disciplinary notice, which contained a description of the events leading to his suspension and the punishments to be enforced, including withholding his annual bonus, being placed on probation for ninety days, and working Monday through Friday.[5] (C.S.F. ¶ 8 (ECF No. 31 at 3); Ambrose Dep. at 47 (ECF No. 21-5 at 7); Documentation of Discussion with Employee (ECF No. 21-2 at 25).) The disciplinary notice contained a space for Plaintiff to enter his own version of events. (Documentation of Discussion with Employee (ECF No. 21-2 at 25).) Plaintiff stated he could not sign the disciplinary document because it falsely stated that he slept on the job. (C.S.F. ¶ 21, 22 (ECF No. 31 at 20); Bonkowski Dep. at 88 (ECF No. 23-1 at 7).) Ambrose and Santi informed Bonkowski that he would have to sign the disciplinary notice before he could return to work. (C.S.F. ¶ 23 (ECF No. 31 at 21); Bonkowski Dep.

---

[5] Working a schedule of Monday through Friday effectively precluded Plaintiff from having the ability to work overtime, which Plaintiff regularly did work. (Bonkowski Dep. at 65 (ECF No. 21-2 at 65).)

at 88 (ECF No. 23-1 at 7)).) During the course of the meeting, Ambrose told Plaintiff that he should not blame his alleged sleeping on his "medical condition."[6] (C.S.F. ¶ 24 (ECF No. 31 at 21); Bonkowski Dep. at 89 (ECF No. 23-1 at 7)).)

At this point, Bonkowski began to experience shortness of breath, chest pain and dizziness. (C.S.F. ¶ 27 (ECF No. 31 at 21); Bonkowski Dep. at 92 (ECF No. 23-1 at 8)).) He asked Ambrose and Santi for permission to go home and continue the meeting the next day.[7] (C.S.F. ¶ 29, 30 (ECF No. 31 at 22); Bonkowski Dep. at 93 (ECF No. 23-1 at 8)).) Ambrose and Santi both said "yes" to plaintiff's requests and let him leave the meeting. (C.S.F. ¶ 30 (ECF No. 31 at 22).) Plaintiff clocked out at 5:18 p.m. and went home to try to slow down his breathing and heart rate. (C.S.F. ¶ 32 (ECF No. 31 at 23); Bonkowski Dep. at 98 (ECF No. 23-1 at 9)).)

Upon arriving home, Plaintiff's wife, Lisa Bonkowski ("Mrs. Bonkowski"), observed that Plaintiff appeared to be as "white as a ghost" and was clutching at his chest. (C.S.F. ¶ 31 (ECF No. 31 at 23); Lisa Bonkowski Deposition ("Mrs. Bonkowski Dep.") at 21-22 (ECF No. 23-12 at 3-4)).) Plaintiff stayed home for several hours while he tried to slow his heartbeat and catch his breath. (C.S.F. ¶ 32 (ECF No. 31 at 23); Bonkowski Dep. at 98 (ECF No. 23-1 at 9)).) Shortly after 11 p.m., Mrs. Bonkowski drove Plaintiff to Butler Memorial Hospital where they arrived just before midnight. (C.S.F. ¶ 33, 34 (ECF No. 31 at 23); Bonkowski Dep. at 98-99 (ECF No. 23-1 at 9)).)

---

[6] The only evidence of Ambrose's alleged statement comes from Plaintiff's deposition and is disputed by Defendant. (C.S.F. ¶ 23 (ECF No. 31 at 21).)

[7] Defendant alleges that Plaintiff was "agitated, argumentative, defensive and confrontational" during the meeting. (C.S.F. ¶ 27 (ECF No. 31 at 21-22); Ambrose Dep. at 46-47 (ECF No. 21-5 at 6-7); Santi Dep. at 41-42 (ECF No. 21-4 at 8-9).) Ambrose stated that Plaintiff did not request to leave, but stated that he was leaving. (C.S.F. ¶ 28 (ECF No. 31 at 22); Ambrose Dep. at 50 (ECF 21-5 at 10).)

8

Plaintiff was admitted into the hospital as an inpatient shortly after midnight. (C.S.F. ¶ 37 (ECF No. 31 at 24); Discharge Inpatient Report at 1-7 (ECF 23-14).) Mrs. Bonkowski used Plaintiff's mobile telephone to call his co-worker Don Latessa to inform him that Bonkowski was admitted to the hospital. (C.S.F. ¶ 47 (ECF No. 31 at 28); Mrs. Bonkowski Dep. at 26 (ECF No. 21-6 at 3); Jeff Bonkowski Telephone Records ("Telephone Records") at 11/15, 1:37 a.m. (ECF No. 21-6 at 9).)

**E. November 15, 2011**

On November 15, 2011, at approximately 7:30 a.m., Dilick informed Proviano that Bonkowski walked off the job after the second meeting on November 14, 2011. (C.S.F. ¶ 19 (ECF No. 31 at 8); Proviano Dep. at 72 (ECF No. 23-2 at 9).) Proviano made the decision to speak with some of the other supervisors later in the day to further discuss the events of the prior evening.[8] (C.S.F. ¶ 67 (ECF No. 31 at 34); Proviano Timeline at 3 (ECF No. 23-18 at 3).) At approximately 9:02 a.m., after Proviano's first discussion with Dilick, but before meeting with all the supervisors, Mrs. Bonkowski called Proviano to inform him that Plaintiff would not be in to work because he was in the hospital. (C.S.F. ¶ 69 (ECF No. 31 at 35); Proviano Timeline (ECF No. 23-18 at 3); Mrs. Bonkowski Dep. at 29 (ECF No. 21-6 at 3).) Mrs. Bonkowski testified that she informed Proviano that Plaintiff became sick during the second meeting on November 14, 2011. (C.S.F. ¶ 64 (ECF No. 31 at 33); Mrs. Bonkowski Dep. at 29 (ECF No. 21-6 at 3).) According to Mrs. Bonkowski's testimony, Proviano stated that he was going to find out what happened and

---

[8] Defendant asserts that the decision to terminate Plaintiff was made during the first discussion with Dilick at 7:30 a.m. (C.S.F. ¶ 20 (ECF No. 31 at 9).) Proviano testified that the second meeting with the additional supervisors was done as a "courtesy." (Proviano Dep. at 85 (ECF No. 23-2 at 12).)

9

that he was unaware of these events. (C.S.F. ¶ 64 (ECF No. 31 at 33); Mrs. Bonkowski Dep. at 29 (ECF No. 21-6 at 3)).

At approximately 9:41 a.m., Mrs. Bonkowski called Ambrose to inform him that her husband was in the hospital and to request FMLA paperwork. (C.S.F. ¶ 54 (ECF No. 31 at 30); Mrs. Bonkowski Dep. at 4 (ECF No. 21-6 at 31); Bonkowski Phone Records at 11/15 9:41 a.m. (ECF No. 21-6 at 9).) This phone call lasted 1 minute because Ambrose hung up on Mrs. Bonkowski. (Id.) At 9:45 a.m., Mrs. Bonkowski left a voicemail for Proviano describing the brief conversation with Ambrose and requesting FMLA paperwork. (C.S.F. ¶ 56 (ECF No. 31 at 30); Mrs. Bonkowski Dep. at 32 (ECF No. 21-6 at 4); Proviano Dep. at 86, 87 (ECF No. 23-2 at 12).) Proviano called Mrs. Bonkowski back at approximately 4:49 p.m. (C.S.F. ¶ 57 (ECF No. 31 at 31); Mrs. Bonkowski Dep. at 37 (ECF No. 21-6 at 5); Bonkowski Phone Records at 11/15, 4:49 p.m. (ECF No. 21-6 at 9).) During this phone call, Proviano explained the FMLA process to Mrs. Bonkowski. (C.S.F. ¶ 57 (ECF No. 31 at 31); Mrs. Bonkowski Dep. at 37 (ECF No. 21-6 at 5); Plaintiff's Exhibit No. 19 at 2 (ECF No. 23-19 at 2).)

Plaintiff was released from Butler Memorial Hospital in the early evening with no restrictions on his activities. (C.S.F. ¶ 42 (ECF No. 31 at 26); Plaintiff's Exhibit No. 16 (ECF No. 23-16).) The comprehensive testing that was performed as a result of Bonkowski's inpatient care did not find any complications with his heart condition or diabetes. (C.S.F. ¶ 16 (ECF No. 31 at 7,8); Bonkowski Dep. at 100-101 (ECF No. 23-1 at 9); Plaintiff's Exhibit No. 14 (ECF No. 23-14).) Bonkowski received an excuse from his doctor for missing work on November 15, 2011. (Plaintiff's Exhibit No. 15 (ECF No. 23-15).)

### F. November 16, 2011: Termination

On November 16, 2011, prior to Plaintiff's scheduled shift, Proviano called Bonkowski to inform him that his employment was terminated because he walked off the job. (C.S.F. ¶ 80 (ECF No. 31 at 38); Bonkowski Dep. at 103 (ECF No. 23-1 at 10).) Plaintiff testified that he told Proviano that Ambrose and Santi gave him permission to leave on November 14, 2011. (C.S.F. ¶ 81 (ECF No. 31 at 38); Bonkowski Dep. at 103 (ECF No. 23-1 at 10).) According to Plaintiff's testimony, Proviano responded by stating that he would "get back" to Bonkowski. (C.S.F. ¶ 82 (ECF No. 31 at 39); Bonkowski Dep. at 103, 104 (ECF No. 23-1 at 10).) Shortly thereafter, Proviano called Bonkowski back, and officially terminated him from Oberg for "walking off-the-job and the meeting." (C.S.F. ¶ 83 (ECF No. 31 at 39); Bonkowski Dep. at 104 (ECF No. 23-1 at 10).)

### III. *Standard of Review*

Federal Rule of Civil Procedure 56(a) provides that "[t]he court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to summary judgment as a matter of law." FED. R. CIV. P. 56(a). A motion for summary judgment will not be defeated by the mere existence of some disputed facts, but will be defeated when there is a genuine issue of material fact. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 247-48 (1986). In determining whether the dispute is genuine, the court's function is not to weigh the evidence or to determine the truth of the matter, but only to determine whether the evidence of record is such that a reasonable jury *could* return a verdict for the nonmoving party. Id. at 249 (emphasis added). The court is to draw all reasonable inferences in

favor of the nonmoving party. El v. Se. Pa. Transp. Auth., 479 F. 3d 232, 238 (3d Cir. 2007) ("In considering the evidence, the court should draw all reasonable inferences against the moving party.").

The Third Circuit Court of Appeals has stated:

> [I]f there is a chance that a reasonable factfinder would not accept a moving party's necessary propositions of fact, pre-trial judgment cannot be granted. Specious objections will not of course defeat a motion for summary judgment but real questions about credibility, gaps in the evidence, and doubts as to the sufficiency of the movant's proof, will.

Id. The court may consider any material or evidence that would be admissible or usable at trial in deciding the merits of a motion for summary judgment. Horta v. Sullivan, 4 F. 3d 2, 8 (1st Cir. 1993) (citing 10A CHARLES ALAN WRIGHT, ARTHUR R. MILLER & MARY KAY KANE, FEDERAL PRACTICE AND PROCEDURE § 2721, at 40 (2d ed. 1983)); Pollack v. City of Newark, 147 F. Supp. 35, 39 (D.N.J. 1956), aff'd, 248 F.2d 543 (3d Cir. 1957) ("[I]n considering a motion for summary judgment, the court is entitled to consider exhibits and other papers that have been identified by affidavit or otherwise made admissible in evidence.").

## IV. Discussion

Congress enacted the FMLA in 1993 in part to address problems associated with "inadequate job security for employees who have serious health problems that prevent them from working for temporary periods." 29 U.S.C. § 2601(a)(4). The act was designed to provide a balance between "entitling employees to take reasonable leave for medical reasons" and "accommodat[ing] the legitimate interests of employers." 29 U.S.C. § 2601(b)(2-3). In order for an employee to be eligible for protection under the FMLA, the employee must work for an employer for at least twelve months and perform

at least 1250 hours of service with that employer during the previous twelve months. 29 U.S.C. § 2611 (2)(A)(I-II). Individuals employed at a worksite where the employer employs less than fifty employees within 75 miles of that worksite, however, are excluded from protection under the FMLA. 29 U.S.C. § 2611 (2)(B)(II). The FMLA grants eligible employees the right to take up to twelve workweeks of leave during a twelve-month period for any of the following reasons:

> (A) Because of the birth of a son or daughter of the employee and in order to care for such son or daughter
> 
> (B) Because of the placement of a son or daughter with the employee for adoption or foster care.
> 
> (C) In order to care for the spouse, or a son, daughter, or parent, of the employee, if such [person] has a serious medical condition.
> 
> (D) Because of the serious health condition that makes the employee unable to perform the functions of the position of such employee.
> 
> (E) Because of any qualifying exigency (as the Secretary shall, by regulation, determine) arising out of the fact that the spouse, or a son, daughter, or parent of the employee is on active duty (or has been notified of an impending call or order to active duty) in the Armed Forces in support of a contingency operation.

29 U.S.C. § 2612(a)(1)(A-E). Only § 2612(a)(1)(D) is implicated in this case. That section refers to a "serious health condition." 29 U.S.C. § 2612(a)(1)(D). A "serious health condition" is defined as "an illness, injury, impairment, or physical condition that involves (A) inpatient care in a hospital, or (B) continuing treatment by a health care provider." 29 U.S.C. § 2611(11); see 29 C.F.R. § 825.114 (defining inpatient care as "an overnight stay at a hospital").

In those instances where an employee qualifies for FMLA leave, the right to leave does not vest in the employee until adequate notice of the need for leave is given to his or

her employer. 29 U.S.C. § 2612(e). When the need for leave is foreseeable, an employee is required to give notice to his or her employer thirty days prior to taking leave. 29 C.F.R. § 825.302(a). If the need for leave is unforeseeable, however, an employee must communicate the need for leave to the employer "as soon as practicable" and provide sufficient information for an employer to determine reasonably whether the FMLA may apply. 29 C.F.R. § 825.303(a-b).

Under the FMLA, employers may not "interfere with, restrain, or deny the exercise of or attempt to exercise" the rights of eligible employees. 29 U.S.C. § 2615(a)(1). Additionally, employers may not "discharge or in any other manner discriminate against any individual for opposing any practice made unlawful." 29 U.S.C. § 2615(a)(2). "The former provision is generally, if imperfectly, referred to as 'interference' whereas the latter is often referred to as 'retaliation.'" Lichtenstein v. Univ. of Pittsburgh Med. Ctr., 691 F.3d 294, 301 (3d Cir. 2012) (citing Callison v. City of Philadelphia, 430 F.3d 117, 119 (3d Cir.2005). Under the regulatory scheme promulgated by the Department of Labor, employers are barred from considering an employee's FMLA leave "as a negative factor in employment actions." 29 C.F.R. § 825.220(c).

Upon returning from leave, the employee has the right to be restored to his or her former position or a position of equivalent benefits, pay and other terms of employment. 29 U.S.C. § 2614(a)(1)(A-B).

**A. Applicability of FMLA—Serious Health Condition**

Plaintiff argues he was entitled to FMLA leave under § 2612(a)(1)(D) because he had a "serious health condition." (ECF No. 26 at 3.) Plaintiff does not assert he was entitled to FMLA leave under any other provision of § 2612(a)(1), i.e., 2612(a)(1)(A)-(C)

or (E). Defendant argues in its motion for summary judgment that Plaintiff was not entitled to FMLA leave because he did not have a "serious health condition" as defined by the FMLA. (ECF No. 18 at 1-2.) Defendant argues that under those circumstances, Plaintiff's claims for retaliation and interference asserted under the FMLA fail as a matter of law. (Id.) Plaintiff does not dispute that if he was not qualified for leave under § 2612(a)(1)(D), i.e., if he did not have a serious health condition, his claims fail as a matter of law.

The FMLA defines a "serious health condition" as "an illness, injury, impairment, or physical condition that involves (A) inpatient care in a hospital, or (B) continuing treatment by a health care provider." 29 U.S.C. § 2611(11). There is no assertion in this case that the continuing treatment prong is relevant. Only the prong referring to inpatient care is in issue. The Department of Labor ("DOL") regulations define "inpatient care" as:

> an overnight stay in a hospital, hospice or residential medical care facility, including any period of incapacity as defined in 29 C.F.R. § 825.113(b), or any subsequent treatment in connection with such inpatient care.

29 C.F.R. § 825.114.[9] Defendant argues that Plaintiff did not have a "serious health condition" as defined by the FMLA and its regulations because he was formally admitted

---

[9] Plaintiff argues that because the hospital designated him as an inpatient, he stayed overnight at the hospital. (ECF No. 26 at 6.) Plaintiff cites to the definition of inpatient provided by The Free Dictionary by Farlex in support of his argument. (ECF No. 26 at 6.) The definition provides that an inpatient is "[a] patient who is admitted to a hospital or clinic for treatment that requires at least one overnight stay." The Free Dictionary by Farlex, http://www.thefreedictionary.com/inpati-ent (last visited on Jan. 16, 2014).

Plaintiff's argument lacks merit. The court must define "inpatient care" to determine whether plaintiff's condition qualified as a serious medical condition under the FMLA. Inpatient care is defined in the regulations as *an overnight stay*, meaning a plaintiff **must** stay overnight to qualify as receiving inpatient care. Accepting plaintiff's definition of inpatient, the hospital designating him as an inpatient meant—at most—that plaintiff's condition required one overnight stay. The designation does not mean that

15

as an inpatient into Butler Memorial Hospital after midnight on November 15, 2011, and discharged on the same calendar day, which does not constitute an "overnight" stay in a hospital. (ECF No. 19 at 5). According to defendant, "an overnight stay in a hospital" means a stay in a hospital from "one day to the next, measured by the inpatient's date of admission and discharge." (ECF No. 28 at 6). Plaintiff argues that he stayed overnight at the hospital from November 14, 2011, to November 15, 2011, because he arrived at the hospital shortly before midnight and was discharged in the early evening of the following day.[10] Neither of those arguments is sufficient to resolve this issue.

---

plaintiff *actually* stayed overnight at the hospital, i.e., that he received inpatient care and is qualified for protection under the FMLA.

[10] In arguing that same day admission and discharge from a hospital does not constitute an "overnight stay," Defendant relies upon Estate of Landers v. Leavitt, 545 F.3d 98 (2d Cir. 2008). In Leavitt, the court needed to determine how to count the amount of days spent as an inpatient under Medicare Part A. The Medicare statute provides coverage for post-hospital stays in skilled nursing home facilities after a beneficiary receives medical services as an "inpatient for not less than three consecutive days" in a hospital. 42 U.S.C. § 1395x(i). Like the FMLA statute, the Medicare statute did not define a method for determining one day of inpatient care. The Court of Appeals for the Second Circuit concluded that time spent in observation and in the emergency room did not count as time receiving medical assistance as an inpatient for purposes of establishing coverage under Medicare Part A. Leavitt, at 112. The court in Leavitt expressly rejected the holding in Jenkel v. Shalala, 845 F.Supp. 69 (D. Conn. 1994), that "later 'formal admission' of a patient following treatment in an emergency room operates as 'a nunc pro tunc ratification of her de facto admission at the time of her arrival in the emergency room.'" Leavitt, at 112.

Defendant argues that the rationale in Leavitt is persuasive and that Plaintiff cannot establish a "serious health condition" under the FMLA because he was formally admitted as an inpatient and discharged on the same calendar day. (ECF No. 28 at 5). This argument refutes Plaintiff's assertion that his arrival at Butler Memorial prior to midnight on November 14, 2011, counts as time spent as an inpatient. According to Plaintiff's interpretation, his stay from November 14, 2011, to November 15, 2011, would count as an overnight stay. (ECF No. 26 at 6).

Under Leavitt, Plaintiff's arrival at Butler Memorial Hospital did not begin his inpatient stay; rather, plaintiff became an inpatient when he was formally admitted after midnight. The court does not need to determine whether to follow the rationale in Leavitt.

Because neither the FMLA nor the DOL regulations define the term "overnight," the court is "bound to give the word[] [its] 'ordinary meaning.'" Abraham v. St. Croix Renaissance Grp. L.L.L.P., 719 F.3d 270, 277 (3d Cir. 2013) (quoting United States v. Diallo, 575 F.3d 252, 256-57 (3d Cir. 2009)). The court may rely upon dictionary definitions of a word to discern its ordinary meaning. Abraham, 719 F.3d at 277 n.6. The Merriam-Webster Dictionary defines "overnight" as "for or during the entire night." Merriam-Webster's Online Dictionary, http://www.merriam-webster.com/dictionary/overnight (last visited on Jan. 16, 2014). The Oxford Dictionaries defines "overnight" as "for the duration of a night." Oxford Dictionaries' Online Dictionary, http://www.oxforddictionaries.com/us/definition/american_english/overnight (last visited on Jan. 16, 2014). The ordinary meaning of "overnight" in this context is "for the duration of the night." Plaintiff can establish he had a qualifying serious medical condition only if he is able to establish he spent the entire[11] "night" as an inpatient at the hospital. In order to assess whether he presented sufficient evidence to do so, requires defining the word "night."

The Merriam-Webster Dictionary defines "night" as "the time from dusk to dawn when no sunlight is visible." Merriam-Webster's Online Dictionary, http://www.merriam-webster.com/dictionary/night (last visited on Jan. 16, 2014). The Oxford Dictionaries defines "night" as "the period from sunset to sunrise in each twenty-four hours." Oxford Dictionaries' Online Dictionary, http://www.oxforddictionaries.com/us/definition/americ-

---

Based upon the plain meaning of the word "overnight," even considering the time prior to plaintiff's formal admission, he did not stay overnight at the hospital.

[11] "Duration" is defined as "the length of time that something exists or lasts." Merriam-Webster's Online Dictionary, http://www.merriam-webster.com/dictionary/duration (last visited on Jan. 16, 2014).

an_english/night (last visited on Jan. 16, 2014). The Federal Aviation Administration in its regulations defines night as: "the time between the end of evening civil twilight and the beginning of morning civil twilight, as published in the Air Almanac, converted to local time." 15 C.F.R. § 1.1. Based upon these definitions, an "overnight" stay at a hospital is a stay from sunset on one day to sunrise the next day.

The parties did not present any evidence with respect to the time of sunset on November 14, 2011, or the time of sunrise on November 15, 2011. Under Federal Rule of Evidence 201, the court may take judicial notice of "a fact that is not subject to reasonable dispute because it…can be accurately and readily determined from sources whose accuracy cannot reasonably be questioned." FED. R. EVID. 201(b)(2). The Old Farmer's Almanac is a source used to determine the time of sunset and sunrise. The court takes judicial notice that in the area where the Butler Memorial Hospital is located, on November 14, 2011, the day plaintiff entered the hospital, the sun set at 5:02 p.m., and on November 15, 2011, the day plaintiff was released from the hospital, the sun rose at 7:07 a.m.[12] The Old Farmer's Almanac, http://www.almanac.com/astronomy/rise/zipcode/160-01/2011-11-14 and http://www.almanac.com/astronomy/rise/zipcode/16001/2011-11-15 (last visited on Jan. 16, 2014). These facts are not subject to reasonable dispute because they can be accurately and readily determined from The Old Farmer's Almanac, a source whose accuracy cannot reasonably be questioned. See Schaffer v. Clinton, 240 F.3d 878,

---

[12] The court used the zip code of Butler Memorial Hospital to determine the time of sunrise and sunset for plaintiff's location on November 14 and 15, 2011. The court takes judicial notice that Butler Memorial Hospital's zip code is 16001. Butler Health System, http://www.butlerhealthsystem.org/Locations/Pages/Hospitals.aspx (last visited on Jan. 16, 2014).

885 n.8 (10th Cir. 2001); Wayne v. Leal, Civ. Action No. 07-1605, 2009 WL 2406299, at *4 (S.D. Cal. Aug. 4, 2009); Allen v. Allen, 518 F.Supp. 1234, 1236 (E.D. Pa. 1981).

Based upon the foregoing discussion, Plaintiff must put forth evidence that he was in the hospital from November 14, 2011, at 5:02 p.m. until November 15, 2011, at 7:07 a.m. to show his condition qualified as a serious medical condition under the FMLA. The undisputed evidence in this case is that Plaintiff arrived at Butler Memorial Hospital shortly before midnight on November 14, 2011. (C.S.F. ¶ 33, 34 (ECF No. 31 at 23); Bonkowski Dep. at 98-99 (ECF No. 23-1 at 9).) He was admitted as an inpatient shortly after midnight on November 15, 2011. (C.S.F. ¶ 37 (ECF No. 31 at 24); Discharge Inpatient Report at 1-7 (ECF 23-14).) He remained at the hospital as an inpatient until the evening of November 15, 2011. (C.S.F. ¶ 42 (ECF No. 31 at 26); Plaintiff's Exhibit No. 16 (ECF No. 23-16).) The undisputed evidence of record shows that plaintiff did not stay overnight as an inpatient in the hospital because he did not arrive at the hospital until shortly before midnight on November 14, 2011, almost seven hours after the sun set that day. Plaintiff, therefore, failed to show that he spent the duration of the night at Butler Memorial Hospital. In other words, no reasonable jury could find that plaintiff's absence from work on November 15, 2011, was a qualifying absence under the FMLA entitling him to protection from Defendant's interference or retaliation with his FMLA rights. Defendant's motion for summary judgment must be granted. Plaintiff's claims for retaliation and interference asserted under the FMLA will be dismissed with prejudice. In light of this conclusion, the other arguments raised by the parties do not need to be addressed.

### V. *Conclusion*

After considering the undisputed material facts of record, viewing all disputed facts in the light most favorable to the nonmoving party, and drawing all reasonable inferences in favor of the nonmoving party, Defendant's motion for summary judgment is GRANTED. Plaintiff's claims for retaliation and interference asserted against Defendant under the FMLA will be dismissed with prejudice. An appropriate order will be entered.

Dated: January 17, 2014

By the court,

/s/ Joy Flowers Conti
Joy Flowers Conti
Chief United States District Judge